UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL SAINT-MARTIN and JOHN DOE, <br><br> Plaintiffs, <br><br> v. <br><br> BRANDON PRICE, <br><br> Defendant. | No. 1:18-cv-00123-DAD-SKO <br><br> <u>ORDER RE DENIAL OF MOTION FOR TEMPORARY RESTRAINING ORDER</u> <br><br> (Doc. No. 4) |

On January 23, 2018, plaintiffs filed their complaint in this action alleging claims under the First and Fourteenth Amendment. (Doc. No. 1.) On January 25, 2018, plaintiffs filed a motion for a temporary restraining order ("TRO") seeking to prevent defendants from confiscating and destroying their electronic devices. (Doc. No. 4.) An opposition was filed on January 26, 2018. (Doc. No. 9.) The court held a telephonic hearing on the matter on January 26, 2018, at which attorney Janice Bellucci appeared on behalf of plaintiffs and California Deputy Attorney General Lisa Tillman appeared on behalf of defendants. At the conclusion of that hearing, the court denied plaintiffs' motion for a TRO and indicated that a written order denying the motion would follow. The court now writes to explain its reasons for the denial, which are set forth below.

/////

1

**BACKGROUND**

Plaintiffs' complaint alleges as follows. California State Hospital – Coalinga ("CSH-Coalinga") is a psychiatric hospital overseen by the California Department of State Hospitals which houses approximately 1,300 patients, including plaintiffs, and employs approximately 2,300 staff. (Doc. No. 1 ("Complaint") at ¶ 14.) Patients at CSH-Coalinga have been civilly committed under California state laws such as the Sexually Violent Predators Act ("SVPA"). (*Id.*) In approximately 2006, the City of Coalinga annexed CSH-Coalinga. (*Id.* at ¶ 15.) As such, patients at CSH-Coalinga are currently eligible to vote in elections held by the City of Coalinga. (*Id.*) In 2010, patients at CSH-Coalinga organized a group known as Detainee-Americans for Civic Equality ("DACE") to educate CSH-Coalinga patients about their voting rights and to facilitate civic engagement on their part. (*Id.* at ¶ 16.)

Relevant to this motion, DACE was allegedly active in the run-up to a November 7, 2017 election in Coalinga, which considered a local proposition known as Measure C. (*Id.* at ¶ 17.) Measure C proposed a one cent increase in the sales tax in Coalinga, in order to overcome a budget shortfall and avoid the layoffs of 23 city employees. (*Id.*) Measure C would have applied to goods sold in CSH-Coalinga. (*Id.*) DACE contacted various city officials in October 2017 to lobby the city about issues concerning CSH-Coalinga patients, particularly to discuss the proposed sales tax as well as transportation services for visitors to and from CSH-Coalinga. (*Id.* at ¶ 18.) Because the city officials failed to engage DACE in a meaningful way in advance of the vote, DACE advised the officials that they would recommend patients at CSH-Coalinga vote "no" on Measure C. (*Id.* at ¶¶ 19–20.) Measure C subsequently failed to pass by a margin of 37 votes, with 545 votes in favor of the measure and 582 opposed. (*Id.* at ¶ 21.) Because voters from CSH-Coalinga cast 177 votes, including 127 "no" votes, city officials "scapegoated" the patients of CSH-Coalinga. (*Id.* at ¶¶ 22–23.) Subsequently, city officials began to assert that patients at CSH-Coalinga should be disqualified from voting in city elections. (*Id.* at ¶ 24.)

Plaintiffs believe that staff at CSH-Coalinga was generally in favor of Measure C. They allege CSH-Coalinga staff tore down plaintiff Saint-Martin's flyers encouraging a "no" vote on Measure C. (*Id.* at ¶ 29.) They also told Saint-Martin that the patients should not vote in the

election, but if they did, they should vote in favor of Measure C. (*Id.*) Additionally, some of the city employees who lost their jobs are believed to be family members and friends of staff members working at CSH-Coalinga. (*Id.* at ¶ 25.)

Following the failed sales tax measure, staff at CSH-Coalinga allegedly began a retaliatory campaign to deprive plaintiffs of tools they use to participate in local politics, namely computers and electronic storage devices. (*Id.* at ¶ 26.) These items allow patients to draft documents about elections and other political issues and communicate with supporters, attorneys, and government officials outside of the hospital. (*Id.* at ¶ 27.) In December 2017, hospital staff encouraged CSH-Coalinga patients to digitize and then destroy hard copies of various legal materials in order to free up physical space in the housing units, and made scanners and shredders available to the patients for that purpose. (*Id.* at ¶ 30.) However, later that same month, the hospital enacted emergency regulations[1] banning the same computers and storage devices onto which patients had just scanned their legal materials at the direction of staff. (*Id.* at ¶ 31.) The emergency regulations were ostensibly promulgated in order to address the distribution of child pornography at CSH-Coalinga. (*Id.* at ¶ 34.) However, plaintiffs assert that a ban on access to the Internet, which was designed to remedy the possession and distribution of child pornography, had been in place since 2009, thus indicating that there was no emergency need to change the regulations at issue. (*Id.* at ¶ 35.) In light of these circumstances, plaintiffs allege that the rule changes are, in fact, retaliation for patients at CSH-Coalinga voting "no" on Measure C. (*Id.* at ¶¶ 41–42.)

## LEGAL STANDARD

The standard for issuing a temporary restraining order is "substantially identical" to the standard for issuing a preliminary injunction. *See Stuhlbarg Intern. Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to

---

[1] Emergency regulations in California are promulgated pursuant to California Government Code §§ 11346.1 and 11349.6, which permits agencies to engage in rulemaking on an expedited basis without fulfilling various notice and analysis requirements.

3

suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction."); *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). The Ninth Circuit has held that, in the alternative, "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 97 (9th Cir. 2008) (en banc)).[2] The party seeking the injunction bears the burden of proving these elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009). Finally, an injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

## ANALYSIS

Plaintiffs allege two separate claims here: one for retaliation in violation of the First Amendment and the other for violation of their due process rights under the Fourteenth Amendment. (*See* Doc. No. 1.) Each is addressed below.

/////

/////

/////

/////

/////

/////

---

[2] The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale approach survives "when applied as part of the four-element *Winter* test." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011). "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

4

1. First Amendment Retaliation

First Amendment retaliation, at least in the prison context,[3] entails five elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (footnote omitted).

Defendant here challenges plaintiffs' showing with respect to the second and fifth elements of their claim,[4] asserting that the regulations were promulgated to combat the dissemination of child pornography at CSH-Coalinga, a legitimate goal for the institution, not to retaliate against plaintiffs. The fifth element of plaintiffs' retaliation claim requires them to demonstrate that the regulations do "not reasonably advance a legitimate [treatment or threat

/////

---

[3] Plaintiffs here are civil detainees, not prisoners. This distinction is, at times, legally relevant. *See, e.g.*, *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982) ("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."); *Page v. Torrey*, 201 F.3d 1136, 1140 (9th Cir. 2000) (holding civil detainee was not subject to the Prison Litigation Reform Act ("PLRA")). Here, neither party has suggested that the elements of a First Amendment retaliation claim differ when brought by civil detainees as opposed to prisoners. The court has located no cases making such a distinction, and it appears that courts have applied these same standards in assessing claims brought by civil detainees as are applied to such claims brought by convicted prisoners. *See, e.g.*, *Walker v. King*, No. 1:16-cv-01665-EPG(PC), 2017 WL 1018295, at *4 (E.D. Cal. Mar. 15, 2017); *Smith v. Napa State Hosp.*, No. CV 16-7700-JAK (KK), 2016 WL 6238480, at *3 (C.D. Cal. Oct. 25, 2016); *Ryan v. Siqueiros*, No. 1:15-cv-01152 DLB PC, 2016 WL 2898450, at *3 (E.D. Cal. May 18, 2016); *Irvin v. Baca*, No. CV 03-2565-AHS(CW), 2011 WL 838915, at *22 (C.D. Cal. Jan. 18, 2011). Therefore, the court presumes this test applies to civil detainees as it does to prisoners.

[4] Defendant also asserts the political question doctrine prevents the court from considering this challenge. (*See* Doc. No. 9 at 10.) The political question doctrine applies "where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)). The court is unaware of any provision committing the issue of whether an action is retaliatory under the First Amendment to the California Department of State Hospitals. Nor is there a lack of judicially discoverable and manageable standards for resolving First Amendment retaliation claims. Accordingly, the court finds defendant's political question argument to be unpersuasive.

reduction] goal,"[5] *Rhodes*, 408 F.3d at 568, or were "not tailored narrowly enough to achieve such goals." *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995) (quoting *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985)). Importantly, "[t]he plaintiff bears the burden of pleading and proving the absence of legitimate [treatment or threat reduction] goals for the conduct of which he complains." *Pratt*, 65 F.3d at 806. In determining "whether a proffered legitimate [treatment or threat reduction] interest is reasonably related to a regulation which infringes on a prisoner's constitutional right," courts are to consider these factors:

> First and foremost, "there must be a 'valid, rational connection' between the prison regulation and the legitimate [and neutral] governmental interest put forward to justify it." If the connection between the regulation and the asserted goal is "arbitrary or irrational," then the regulation fails, irrespective of whether the other factors tilt in its favor. In addition, courts should consider three other factors: the existence of "alternative means of exercising the right" available to inmates; "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and "the absence of ready alternatives" available to the prison for achieving the governmental objectives.

*Brodheim*, 854 F.3d at 1272 (quoting *Shaw v. Murphy*, 532 U.S. 223, 228 (2001)).

The first two of these factors favor defendant here. The banning of substantially all electronic devices does serve to address serious concerns regarding the dissemination of child pornography.[6] Additionally, there are alternative means for plaintiffs to exercise their First Amendment rights to vote and engage in political organizing activities. Indeed, the regulations permit hospitals to make available electronic devices on a temporary basis through check-out procedures or in a computer lab. 9 Cal. Code Regs. § 4350(d). Defendant's counsel represented

---

[5] Because plaintiffs are civil detainees and not prisoners, defendant has no legitimate "correctional" goals as pertains to them. As such, the court evaluates this question in light of any proffered legitimate treatment and harm reduction goals. *Hubbart v. Superior Court*, 19 Cal. 4th 1138, 1170–78 (1999) (finding the SVPA was not punitive and noting its goals were to treat those committed by it and reduce the threat of harm to the general public); *People v. Buffington*, 74 Cal. App. 4th 1149, 1152 (1999).

[6] That said, the regulation as written does ban a number of electronic items, such as graphing calculators and CB radios, *see* 9 Cal. Code Regs. § 4350(a), which have no obvious connection to the dissemination of child pornography.

6

at the hearing that twenty-five computers will be available for patient use at the state hospital. Thus, patients will retain the ability to exercise their rights in an alternative manner, by using shared computers rather than personal ones. The third and fourth factors could arguably support plaintiffs' claims here, since a significant change to hospital regulations will have a wide-ranging impact on all staff and patients at the hospitals and there are likely alternatives that could be employed that would have a lesser impact. However, plaintiffs have not demonstrated that these concerns show there is no legitimate treatment or threat reduction goal. While defendant would obviously have no legitimate interest in promulgating a regulation "solely in retaliation for [plaintiffs'] exercise of protected First Amendment rights," *see Pratt*, 65 F.3d at 807, plaintiffs have not made a convincing showing that this was the sole purpose of the challenged regulations. Therefore, the court concludes plaintiffs have not demonstrated that they are likely to succeed on the merits of their claim, because they have not shown the lack of a "legitimate [treatment or threat reduction] goal" for the regulations at issue.[7] *Rhodes*, 408 F.3d at 568.

---

[7] Because the court concludes plaintiffs have not demonstrated a likelihood of success on the fifth element of their retaliation claim, it need not decide whether plaintiffs met their burden in regards to the second element. That said, the second element of this claim requires plaintiffs to show that the protected conduct "was a 'substantial' or 'motivating' factor in the defendant's decision." *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *see also Brodheim*, 584 F.3d at 1271. Plaintiffs do present some evidence that their protected activity was a substantial or motivating factor in the decisions to promulgate the regulation. The short amount of time between the Measure C vote and the issuance of the regulations is some evidence of retaliation. *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003) (noting "suspect timing of the investigation," among other evidence, raised "a triable issue of fact regarding whether the motive . . . was retaliatory"); *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003); *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995) ("[T]iming can properly be considered as circumstantial evidence of retaliatory intent."). Additionally, the alleged actions of some CSH-Coalinga staff members also indicate a general animosity toward plaintiff Saint-Martin's political activity. (Doc. No. 4-1 at 44) (Decl. of Saint-Martin) (asserting CSH-Coalinga staff tore down flyers advocating patients vote "no" on Measure C and told Saint-Martin he should not vote, but if he did, he should vote in favor of Measure C). On the other hand, the record currently before the court contains significant countervailing evidence as well. The finding of emergency by the Department of State Hospitals notes that the regulation at issue, § 4350, was first adopted in 2009 and made permanent in 2010. (Doc. No. 7-3 at 3.) However, due to multiple legal filings from patients at CSH-Coalinga, the hospital "created a moratorium on enforcement of the regulation for patients currently possessing prohibited items," provided those items could not access the Internet. (*Id.*) The validity of § 4350 has been litigated continuously since that time. (*Id.* at 7.) Two decisions in separate cases

2. <u>Fourteenth Amendment Punitive Conditions Claim</u>

Plaintiffs also allege that these regulations violate the Fourteenth Amendment because they are punitive in nature. (Doc. No. 4-1 at 16.) Again, the court concludes plaintiffs have not shown a likelihood of success on the merits of this claim.

The Fourteenth Amendment requires that civilly committed individuals receive "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 321–22.[8] However, "the Constitution only requires that the courts make certain that professional judgment in fact was exercised." *Id.* at 321. Because there "is no reason to think judges or juries are better qualified than appropriate professionals" to make decisions about the care of institutionalized person, professional decisions are "presumptively valid" and violate the law "only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323. Ultimately, a state "may not restrain residents except when and to the extent professional judgment deems this necessary to assure such safety or to provide needed training," and they are entitled to "reasonably nonrestrictive confinement conditions." *Id.* at 324.

---

in the Eastern District of California, one from May 2016 and another from October 2016, led the Department of State Hospitals to conclude it was on firmer legal footing in lifting the moratorium. (*Id.* at 8–9.) While the Department initially elected to wait until the Ninth Circuit affirmed the decisions before acting further, upon further reflection the Department realized the regulation was no longer sufficient to address the technological changes that had occurred since it was drafted in 2009. (*Id.* at 9.) This, coupled with eleven arrests of patients at CSH-Coalinga for possession of child pornography in the summer of 2017, resulted in these regulations being issued on an emergency basis. (*Id.* at 9–10.) In December 2017, California's Fifth District Court of Appeal upheld the authority of CSH-Coalinga to confiscate items prohibited under § 4350, adding further legal support to the anticipated regulation. (*Id.*) In sum, it is far from clear plaintiffs could demonstrate they were likely to succeed on the merits of the second element of their retaliation claim as well.

[8] Plaintiffs rely on the Ninth Circuit's decision in *Jones v. Blanas*, 393 F.3d 918 (9th Cir. 2004) for the standard they must meet under the Fourteenth Amendment. However, that decision concerned an individual who was not yet civilly committed: rather, he had been detained at the Sacramento County Jail *prior to* a commitment proceeding under the SVPA. *See* 393 F.3d at 923–24. The decision in *Jones* is therefore not analogous to the present case, which involves the rights of individuals who have already been committed pursuant to the SVPA.

This has been subsequently known as the "*Youngberg* professional judgment standard." *Ammons v. Wash. Dep't of Soc. & Health Servs.*, 648 F.3d 1020, 1027–28 (9th Cir. 2011). The Ninth Circuit has held that this standard requires courts to "restrict their inquiry to two questions: (1) whether the decisionmaker is a qualified professional entitled to deference, and (2) whether the decision reflects a conscious indifference amounting to gross negligence, so as to demonstrate that the decision was not based upon professional judgment." *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). Ultimately, due process looks to whether plaintiffs are being provided "a realistic opportunity to be cured or improve the mental condition for which they were confined." *Sharp v. Weston*, 233 F.3d 1166, 1172 (9th Cir. 2000); *see also Ore. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1122 (9th Cir. 2003) (holding pretrial criminal detainees found not competent to stand trial could not be detained for prolonged periods in a county jail).

Here, there is insufficient evidence from which the court could conclude either that the regulations were not the result of decisions made by qualified professionals or that the regulations exhibit "conscious indifference amounting to gross negligence." *See Houghton*, 965 F.2d at 1536. Plaintiff Saint-Martin does state in his declaration that "patients who are undergoing treatment need to own electronic storage devices in order to complete written exercises and plans in their treatment courses." (Doc. No. 4-1 at 45.) He also states that "[t]here is nowhere else to store information regarding exercises and plans" and without such information "patients cannot advance in treatment or hope to be released." (*Id.*) However, these statements are belied by the regulation itself. *See* 9 Cal. Code Regs. § 4350(d) (allowing hospitals to permit the use of a computer lab). Moreover, the notice proposing the regulations states that the amendments would allow CSH-Coalinga staff to "provid[e] a more therapeutic inpatient environment by better controlling triggers, stimulants, and temptations." (Doc. No. 4-1 at 32.) Plaintiffs simply have not presented evidence showing they are likely to succeed in claiming that the removal of electronic devices from CSH-Coalinga is not within the reasonable professional judgment of defendant.

/////

/////

3. <u>Alternative Balance of Hardships Test</u>

While the plaintiffs have not demonstrated a likelihood of success on the merits of either of their claims, they may still be entitled to a temporary restraining order if they can show that there are "'serious questions going to the merits'—a lesser showing than likelihood of success on the merits"—and that the "balance of hardships tips *sharply* in [their] favor." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). While plaintiffs suggest that their electronic devices would be seized and destroyed, resulting in the loss of irreplaceable legal, therapeutic, and artistic files (Doc. No. 4-1 at 19), defendant indicates that any patients with legal or therapeutic files they needed to keep could turn their electronic devices over to be scanned. (Doc. No. 7-2 at ¶ 19; *see also* Doc. No. 7-7 at 3.) After the device is scanned for illegal material, CSH-Coalinga staff will schedule an appointment with the patient to allow them to transfer this material to a device that will be available for the patient's use in a computer lab. (Doc. No. 7-2 at ¶ 19; Doc. No. 7-7 at 3.) Thus, plaintiffs have not demonstrated that the balance of hardships here tips sharply in their favor.

**CONCLUSION**

For the reasons set forth above, plaintiffs' motion for temporary restraining order (Doc. No. 4) was denied without prejudice on January 26, 2018.

IT IS SO ORDERED.

Dated: **February 6, 2018**　　　　　*Dale A. Drozd*
　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

10